# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RUTH HUNDLEY, CAROL BUJAK, LITA BROOKS and CAROL REMBOR, individually and on behalf of participants and beneficiaries of the Henry Ford Health System Retirement Savings Plan and the Henry Ford Health System Heritage 403(b) Plan, | Case No..: 2:21-cv-11023 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| HENRY FORD HEALTH SYSTEM, THE BOARD OF DIRECTORS OF HENRY FORD HEALTH SYSTEM, INVESTMENT COMMITTEE, and JOHN DOES 1-40, | |
| Defendants. | |

## I.    INTRODUCTION

1.    Plaintiffs Ruth Hundley, Carol Bujak, Lita Brooks and Carol Rembor ("Plaintiffs"), on behalf of themselves, the Henry Ford Health System Retirement Savings Plan (the "401(a) Plan"), the Henry Ford Health System Heritage 403(b) Plan (the "403(b) Plan") (the 401(a) Plan and 403(b) Plan are referred to collectively as the "Plans"), and all others similarly situated, allege as follows:

2.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against the Plans' fiduciaries, which include Henry Ford Health System, ("HFHS"), the Board of Directors of HFHS and its members ("Board") during the Class Period (defined below), and the Committee and its members ("Committee") during the Class Period for breaches of their fiduciary duties. Defendants HFHS, the Board, and the Committee are referred to collectively as "Defendants".

3.    Defined contribution retirement plans, like the Plans, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held **$7.9 trillion** in all employer-sponsored defined contribution retirement plans as of March 31, 2020. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).[1]

---

[1]Available    at:    https://www.ntsa-net.org/news-resources/ici-retirement-assets-

4.     In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

5.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.     Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

7.     As of December 31, 2018, the 401(a) Plan had $1,348,573,429 in net

---

dropped-12-q1 (last visited April 25, 2021).

assets and the 403(b) Plan had $815,083,905 in net assets. As of December 31, 2019, the 401(a) Plan had $1,563,353,282 in net assets and the 403(b) Plan had $995,730,213, which qualifies the Plans as mega plans. Given their size, the Plans had substantial bargaining power regarding the fees and expenses that are charged against participants' investments. However, to the extent that Defendants made any attempt to reduce the Plans' expenses or to monitor and review the Plans' investment options, they employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to participants were reasonable, and (b) that each investment option that was offered in the Plans was prudent.

8.     During the proposed Class Period of (May 5, 2015 to the present) Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, Plaintiffs, and the Plans' other participants by, *inter alia*: (1) failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; (2) maintaining certain funds in the Plans that were managed by companies affiliated with the Plans' recordkeepers and with expense structures that benefitted the recordkeepers, despite the availability of identical or similar investment options with lower costs and equivalent and/or better performance histories; and (3) in the case of the 403(b) Plan, retaining multiple recordkeepers that, in combination, offer

4

roughly 250 investment options, including numerous funds that employ the same investment strategy and/or style, which has created a confusing, unmanageable and unreasonably expensive array of investment options and caused the 403(b) Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

9.      Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

10.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

11.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

12.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for

nationwide service of process.

13.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the Plans are administered, where at least one of the alleged breaches took place and where Defendants reside.

## III.    STANDING

14.     An action under 29 U.S.C. § 1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). The plan is the victim of the fiduciary breaches alleged herein and will be the recipient of any recovery. *LaRue*, 552 U.S. at 254. Under 29 U.S.C. § 1132(a)(2) any participant, fiduciary, or the Secretary of Labor is authorized to sue derivatively as a representative of a plan to seek relief on behalf of the plan. As explained below, the Plans suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remain exposed to harm and continuing losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent each Plaintiff must also show an individual injury, even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, Plaintiffs have each suffered such an injury, in at least the following ways:

15.     Plaintiffs and all participants in the Plans suffered financial harm as a

result of Defendants' selection and retention of imprudent investment options that deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options.

16.   Plaintiffs' individual accounts in the Plans were harmed because they invested in investment options that would have been removed from the Plans had Defendants properly discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plans, resulting in a loss of retirement savings. In addition, Defendants caused the Plans to pay unreasonable and excessive fees for recordkeeping and other administrative services.

## IV.   PARTIES

### A.   Plaintiffs

17.   Plaintiff Ruth Hundley ("Hundley"), a resident of Woodhaven, Michigan, has been employed by HFHS since July 1987. During her employment, Plaintiff Hundley has participated in both of the Plans. She has invested her 403(b) Plan contributions in the JPMorgan SmartRetirement Income 2030 R6 (48 bps). She has invested her 401(a) Plan contributions in the JPMorgan SmartRetirement DRE

2030 CF-B (47 bps).[2]

18.     Plaintiff Carol Bujak ("Bujak"), a resident of Sterling Heights, Michigan, has been employed by HFHS since March 2000. During her employment, Plaintiff Bujak has participated in each of the Plans. She has invested her 403(b) Plan contributions in the JPMorgan SmartRetirement Income R6 (45 bps). She has invested her 401(a) Plan contributions in the Vanguard Prime Money Market, Inv. (11 bps).

19.     Plaintiff Lita Brooks ("Brooks"), a resident of Detroit, Michigan, has been employed by HFHS since June 2014. During her employment, Plaintiff Brooks participated in the 403(b) Plan and invested in the JPMorgan SmartRetirement 2035 R6 target fund (48 bps).

20.     Plaintiff Carol Rembor ("Rembor") a resident of Brighton, Michigan, was employed by HFHS from July 19, 1989 until January 31, 2017. During her employment, Plaintiff Rembor participated in the 403(b) Plan and invested in the following options offered by the 403(b) Plan: (a) JPMorgan SmartRetirement 2015; (b) Royce Low Priced Stock (Svc) (150 bps); (c) Clearbridge Large Cap Value A (87 bps); (d) MFS Total Return Fund (74 bps); and (e) Fidelity Advisor Strategic

---

[2] The expense ratios for each of Plaintiff's Plan investments are in parentheses and expressed in basis points, which is one hundredth of a percent or equivalently 0.01%. This information is taken from Plan documents and/or Form 5500's for the year ending December 31, 2018.

Income M (101 bps).

21.     Plaintiffs did not have knowledge of all material facts (including, *inter alia*, the investment alternatives that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of the Plans' investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, and information regarding other available and less expensive share classes of the same funds), necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

22.     Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments, because this information is solely within the possession of Defendants prior to discovery. Plaintiffs did not, and could not, review the Committee meeting minutes or other direct evidence of Defendants' fiduciary decision making, or the lack thereof. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**B.     Company Defendant**

23.     HFHS, which maintains its principal place of business at One Ford

9

Place, 4E, Detroit, Michigan, 48202-3450, is the sponsor of each of the Plans and a fiduciary of each of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) HFHS is a named Sponsor and Plan Administrator under the Plans[3], (b) HFHS is a named fiduciary under the Plans, (c) during the Class Period, it exercised discretionary authority and control over Plans' management and/or authority or control over management or disposition of Plan assets, and (d) it appointed the Committee to serve as a fiduciary for each of the Plans.

24.    Under ERISA, fiduciaries with the power to appoint other fiduciaries and service providers have the concomitant fiduciary duty to monitor and supervise their appointees.

25.    At all times relevant to this action, HFHS has been responsible for the administrative and investment responsibilities associated with the Plans and has been the "named fiduciary" for each of the Plans as defined under ERISA.

## C.    Board Defendants

26.    Upon information and belief, the Board of Directors either appointed the members of the Committee and/or oversaw the Committee while it performed its role

---

[3] *See*, *e.g.*, May 2014 Summary of Modification to HFHS Retirement Savings Plan at 5; 2018 Form 5500 for HFHS Heritage 403(b) Plan.

as the fiduciary responsible for selection and monitoring of the Plans' investments and service providers.

27.    Each member of the Board during the Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority to appoint and monitor the Committee, which either had control over Plan management and/or authority or control over management or disposition of the Plans' assets.

28.    The Board and its members during the Class Period are collectively referred to herein as the "Board Defendants."

### D.    Committee Defendants

29.    On information and belief, the Committee is responsible for selecting the funds and/or monitoring the performance of the funds which are available to Participants for investment and for the selection and monitoring of the Plans' service providers.

30.    Additionally, the Committee is charged with the responsibility to review the Plans' investment options on an annual basis.

31.    The Committee is also responsible for appointing the Plans' trustee.

32.    The Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C.

§ 1002(21)(A), because each exercised discretionary authority over management or disposition of Plans' assets.

33.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### E.    Additional John Doe Defendants

34.    To the extent that there are additional officers and employees of HFHS who are/were fiduciaries of the Plans during the Class Period, or were hired as an investment consultant for the Plans during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, HFHS officers and employees who are/were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## V.    THE PLANS

### A.    The 401(a) Plan

35.    The 401(a) Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the 401(a) Plan provides for individual accounts for each participant and for benefits based

solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the 401(a) Plan are based solely on the amounts allocated to each individual's account.

36.     From inception until the 401(a) Plan was closed to new participants December 23, 2017, all employees, other than students and "house staff" were eligible to participate in the 401(a) plan thirty (30) days after hire. Form 5500 2018 at Notes to Financial Statement, Note A. *See* 2007 Summary Plan Description HFHS Savings Plan ("401(a) SPD") and Summary of Material Modifications for the Henry Ford Health System Retirement Savings Plan for 2009, 2011 and 2014.

37.     Participation in the 401(a) Plan was automatic unless the employee opted out of participation within thirty (30) days of the eligibility date.

38.     Great-West Life and Annuity Insurance Company ("Great-West") has served as the trustee for the 401(a) Plan from 2016 to the present. JPMorgan Chase Bank, N.A. served as the Trustee for at least 2015.

39.     Empower Retirement LLC ("Empower"), an affiliate of Great-West, serves as the 401(a) Plan's Recordkeeper. *See* 2018 Form 5500 for 401(a) Plan, Notes to Financial Statements, at 7.

13

**B**.     **The 403(b) Plan**

40.     The 403(b) Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the 403(b) Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any allocation of forfeitures of accounts of participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the 403(b) Plan are based solely on the amounts allocated to each individual's account.

41.     Employees of HFHS and its subsidiaries, other than certain collectively bargained employees, leased employees and independent contractors, are eligible to participate in the 403(b) Plan sixty (60) days after their hire date. *See* 2017 Summary Plan Description HFHS 403(b) Plan ("403(b) SPD") at 3.

42.     The 403(b) Plan currently has three Trustees: Fidelity Management Trust Company ("Fidelity Trust"), Metropolitan Life Insurance Company ("Metlife") and Great-West Trust Company, LLC ("Great-West").[4]

43.     Fidelity Trust and MetLife have served as the trustees for the 403(b) Plan for the entire Class Period.

---

[4] Great-West is a financial holding company and consultant providing trustee and custodial services to employer-sponsored retirement plans, such as the Plans.

14

44.    JPMorgan Chase Bank, N.A. served as a third Trustee in 2014-2015, but was replaced by Great-West in 2016.

45.    Each 403(b) Trustee has three separate Recordkeepers. The 403(b)'s Recordkeepers are: (a) Fidelity Workplace Services LLC ("Fidelity Workplace") for assets held by Fidelity Trust; (b) Empower Institutional ("Empower") for participants with assets held by Great West; and (c) FASCore for participants with assets held by MetLife. *See* 2018 Form 5500 for 403(b) Plan, Notes to Financial Statements, at 6. Prior to 2017, Great-West and/or Empower served as the sole recordkeeper for the 403(b) Plan.

### C.    Contributions

46.    Participants may contribute to their individual accounts in the 403(b) Plan by way of salary deferral contributions and rollover contributions from other defined contribution plans. *See* 403(b) Plan SPD at 3.

47.    Participants are automatically enrolled in the 403(b) Plan after the 60-day eligibility period and initially contribute 1% of Eligible Compensation each pay period. If the Participant does not make any changes to their contribution amount, the automatic contribution increases to 2% of Eligible Compensation in the second year of employment and then 3% of Eligible Compensation in the third year of employment. *See* 403(b) Plan SPD at 4.

48.    Under the 403(b) Plan, Participants are 100% vested immediately in

their salary deferral contributions and any rollover contributions. *See* 403(b) Plan SPD at 4.

49.     With regard to employee contributions in the 401(a) Plan, Participants contribute 2% of their Eligible Compensation up to the Integration Level, and 4% of their Eligible Compensation above the Integration Level. The Integration Level is the maximum amount of earnings on which the Participant pays Social Security (non-Medicare) taxes. *See* 401(a) Plan SPD at 4.

50.     Under the 401(a) Plan, a participant is 100% vested in their salary deferral contributions and any rollover contributions, regardless of the length of service. *Id.* at 4. Employer contributions vest over a five-year schedule. *Id.* at 5.

### D.     The Plans' Investments

51.     According to the 401(a) Plan's annual report on Form 5500, the 401(a) Plan's assets under management for all funds was $1,322,929,914 as of December 31, 2018. As of December 31, 2019, that amount had increased to $1,563,353,282.

52.     The 401(a) Plan permits participants to invest in either (a) JPMorgan SmartRetirement target date funds, or (b) one of four Vanguard funds, one of which is the Vanguard Prime Money Market Fund. Participants can also invest through self-directed brokerage accounts for additional fees. 2018 Form 5500 at Schedule H, Item 4i. Defendants are responsible for determining the appropriateness of each of the 401(a) Plan's investment options and they are required to regularly monitor each

investment's performance.

53.    On information and belief, the qualified default investment designated by the 401(a) Plan's fiduciaries is the age-appropriate JPMorgan SmartRetirement target date fund.

54.    According to the 403(b) Plan's report on Form 5500, the 403(b) Plan's assets under management for all funds was $815,083,905 as of December 31, 2018. As of December 31, 2019, that amount had increased to $995,730,213.

55.    In the 403(b) Plan, contributions of participants who have not affirmatively elected a Plan investment option, are automatically invested in the Qualified Default Investment Alternative ("QDIA"), which is a target retirement date fund offered by the particular recordkeeper selected by the participant[5], unless and until the Participant takes affirmative steps to change his or her investment selections. 403(b) SPD at 4, 9.

56.    The 403(b) Plan's Participants must choose from a bewildering menu of 250 different funds to invest their savings.[6] The selections are dominated by JPMorgan SmartRetirement target date funds and various actively managed Fidelity funds, but also include a perplexing array of other actively managed funds from

---

[5] The SPD states a "Target date fund" without specifying which of the **two** different (expensive and under-performing) target date funds held in the 403(b) Plan.

[6] It is well known that when people are given too many choices, they lose confidence and/or fail to make decisions. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (2009).

investment companies such as Clearbridge, MFS and Invesco Oppenheimer. Form

5500 for 2018 at Schedule H.

## VI.    CLASS ACTION ALLEGATIONS

57.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P.

23 on behalf of themselves and the following proposed classes ("Classes"):[7]

   (a)  All persons, except Defendants and their immediate family
        members, who were participants in or beneficiaries of the 401(a)
        Plan, at any time between May 5, 2015 and the present (the "Class
        Period").

   (b)  All persons, except Defendants and their immediate family
        members, who were participants in or beneficiaries of the 403(b)
        Plan, at any time between May 5, 2015 and the present (the "Class
        Period").

58.    The members of the Classes are so numerous that joinder of all

members is impractical. According to the 2018 Form 5500 filed with the U.S.

Department of Labor for the 401(a) Plan, there were 27,926 participants with account

balances in the 401(a) Plan, as of December 31, 2018. Form 5500 for 401(a) 2018 at

page 2.

59.    According to the 2018 Form 5500 filed with the U.S. Department of

Labor, there were 18,135 participants with account balances in the 403(b) Plan, as

of December 31, 2018. Form 5500 for 403(b) 2018 at page 2.

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in
their motion for class certification or subsequent pleadings in this action.

60. The number of participants in the Plans has not changed significantly during the proposed Class Periods.

61. Plaintiffs' claims are typical of the claims of the members of the Classes. Like other members of the Classes, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other members of the Classes, and managed each of the Plans as a single entity. Plaintiffs' claims and the claims of all members of the classes arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Classes have been similarly affected by Defendants' wrongful conduct.

62. There are questions of law and fact common to the Classes, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      (a.)    Whether Defendants are fiduciaries of the Plans;

      (b.)    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

      (c.)    Whether HFHS and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in

compliance with ERISA;

(d.) The proper form of equitable and injunctive relief; and

(e.) The proper measure of monetary relief.

63. Plaintiffs will fairly and adequately represent the Classes, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Classes. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

64. This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Classes would create a risk of adjudications with respect to individual members of the Classes that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

65. In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally

applicable to the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Classes as a whole.

## VII. DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF THEIR FIDUCIARY DUTIES

66. ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

67. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

68. As described above, Defendants were fiduciaries of the Plans because:

      (a.)   they were so named; and/or

      (b.)   they exercised authority or control respecting

management or disposition of the Plans' assets; and/or

(c.)    they    exercised    discretionary    authority    or
discretionary control respecting management of the
Plans; and/or

(d.)    they had discretionary authority or discretionary
responsibility in the administration of the Plans.

69.    As fiduciaries, Defendants were and are required by ERISA §
404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the
Plans' investments, solely in the interest of the Plans' participants and beneficiaries
and with the care, skill, prudence, and diligence under the circumstances then
prevailing that a prudent person acting in a like capacity and familiar with such
matters would use in the conduct of an enterprise of a like character and with like
aims. These twin duties are referred to as the duties of loyalty and prudence, and
they are "the highest known to the law." *Pfeil v. State Street Bank & Trust Co*.,671
F.3d 585, 591 (6th Cir. 2012)[8]; *Sweda*, 923 F.3d at 333.

70.    The duty of loyalty requires fiduciaries to act with an "eye single" to
the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000)
(internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is

---

[8] Overruled on other grounds by *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409,
134 S.Ct. 2459, 189 L.Ed.2d 457 (2014).

that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

71.    "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

72.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

73.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to

monitor [plan] investments and remove imprudent ones" that exist in a plan, which

is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting

investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty

to act as a prudent man simply by arguing that other funds...could theoretically, in

combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*,

No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011)

(quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir.

2007)).

74.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability

for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with respect
> to the same plan in the following circumstances: (A) if he participates
> knowingly in, or knowingly undertakes to conceal, an act or omission
> of such other fiduciary, knowing such an act or omission is a breach;
> (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C.
> §1104(a)(1), in the administration of his specific responsibilities which
> give rise to his status as a fiduciary, he has enabled such other fiduciary
> to commit a breach; or (C) if he has knowledge of a breach by such
> other fiduciary, unless he makes reasonable efforts under the
> circumstances to remedy the breach.

75.     During the Class Period, Defendants failed to act in the best interests

of the Plans' participants. Investment options chosen for a plan should not favor the

fund provider or plan service provider over the plan's participants. Yet, here, to the

detriment of the Plans and their participants and beneficiaries, the Plans' fiduciaries included and retained in the Plans many investment options that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plans.

76.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plans were being charged appropriate and reasonable fees for each of the Plans' investment options. Additionally, Defendants failed to leverage the size of the Plans to negotiate the lowest expense ratio available for certain investment options maintained and/or added to the Plans during the Class Period.

77.     As set forth in detail below, Defendants breached fiduciary duties to the Plans and their participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VIII.  SPECIFIC ALLEGATIONS

### A.     Improper Management of an Employee Retirement Plan Cost the Plans' Participants Millions in Savings

78.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is

imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

79.   "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[9]

80.   As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

---

[9]   Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited April 25, 2021).

81.     The Ninth Circuit provided an example of the impact of higher fees over a 40-year period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.* Most participants in the 401(a) and 403(b) Plans expect that their accounts will be their principal source of income after retirement. **"The 401(k) is the major source people think** they are going to rely on."[10] Although at all times defined contribution accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

82.     The Employee Benefit Security Administration has calculated that a 1% higher fee over a 35-year period makes a 28% difference in the accumulation of retirement assets at the end of a participant's career. *See* "A Look at 401(k) Plan Fees," *supra*. at 1-2.

83.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for

---

[10] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited April 25, 2021).

selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

84.    The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[11] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

85.    The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[12]

---

[11]   Available at: https://www.ici.org/system/files/attachments/pdf/per22-04.pdf (last visited April 25, 2021).
[12]Available at

86.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their defined contribution plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

### B.     Defendants Breached Their Fiduciary Duties by Failing to Select Lower Cost Passively Managed Funds

87.     Defendants breached their fiduciary duties by failing to investigate and select lower cost alternatives to the numerous investment options in the Plans that have expenses approaching, equaling or exceeding the expense of retail class shares of actively managed funds, *i.e.*, the costs that ordinary individual investors would pay for such investments. In particular, the 401(a) Plan includes a money market fund, for which the 10-yr. yield is 0.66%.[13]. Among the alternatives to the low yield money market fund has been an extremely expensive target retirement date fund, for which there were many lower cost alternatives that have performed at least as well or better than the funds selected by Defendants.

88.     As to the 403(b) Plan, the QDIA for the entirety of the Class Period has been one of two expensive target date funds. Due to the automatic enrollment

---

http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited April 25, 2021).

[13] *See* ¶ 148.

provisions of the 403(b) Plan, by which participants are enrolled without making an affirmative election to participate, the Plan accounts of those participants are automatically invested in a target date fund as the QDIA. Although participants can transition out of the target date funds, this transition would require that a participant take an affirmative step to select another investment and, based on the disproportionate amount of Plan assets in the target date funds, it appears few participants moved their assets out of the QDIA. *See* 2019 Form 5500 for 403(b) Plan, Schedule H at 17.

89. Defendants compounded the harm caused by their imprudent fund selection—and wasted the 403(b) Plan's and participants' assets—by: (a) providing an overwhelming array of approximately *two hundred and fifty investment options*; and (b) maintaining these high-cost options in the 403(b) Plan year after year, including the funds identified below.

90. Courts have noted that "an ERISA fiduciary's duty is derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotations and citations omitted). *See also Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (ERISA "fiduciary duties draw much of their content from the common law of trusts"). Thus, to the extent that ERISA is silent on the appropriate standard for selection and retention of investment options for a plan, courts should seek guidance from trust law. *Varity Corp.*, 516 U.S. at 496–97.

91. Under the common law of trusts, the determination as to whether the selection of an investment is appropriate depends on "the type of trustee and the nature of the breach involved, the availability of relevant *data*, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b (1) (2012). The relevant factors that may be considered include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

92. Here, each investment option within the Plans charged certain fees that are *paid* by deductions from the pools of assets held by the Plans. For passively managed funds, which are designed to track a market index like the Standard & Poor's 500, securities are purchased to match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

93. By contrast, for the Plans' actively managed funds, which have a mix of securities selected by the fund manager based on his or her belief they will beat the market, the Plans have paid higher fees in order to compensate the fund managers and their associates for the work associated with stock and/or bond picking.

94. While higher-cost actively-managed mutual funds may outperform less-expensive passively managed index funds in the short term, they rarely do so in the long term. As noted by Jonnelle Marte in The Washington Post, *Do Any Mutual*

31

*Funds Ever Beat the Market? Hardly* (Mar. 17, 2015), a study by S&P Dow Jones Indices, which analyzed 2,862 actively managed mutual domestic stock mutual funds over a five-year period, found that "just two funds ... managed to hold on to their berths in the top quarter every year for five years running. And for the 2,862 funds as a whole, that record is even a little worse than you would have expected from random chance alone."[14] Thus, the funds in the top quartile in performance failed to replicate performance from year to year. *See also Index funds trounce actively managed funds: Study* (June 26, 2015) (reporting that data shows that "actively managed funds lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.").[15]

95.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967–75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense

---

[14] Available at: https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (last visited April 25, 2021).
[15] Available at: https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (last visited April 25, 2021).

ratio").

96.    The case for index funds was emphasized by *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 34 (1st Cir. 2018), *cert. denied*, 140 S. Ct. 911, 205 L. Ed. 2d 455 (2020), where the First Circuit applied the common law of trusts in ruling that "it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so. Restatement (Third) of Trusts, § 100 cmt. b(1) (loss determinations can be based on returns of suitable index mutual funds or market indexes)...."

97.    Here, both the 401(a) Plan and the 403(b) Plan retained primarily actively-managed funds as investment options despite the fact that these funds charge grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds always were or had become imprudent due to their higher costs relative to the same or similar investments that were readily available to the Plans during the Class Period.

98.    Indeed, during the Class Period, both target date fund issuers, JP Morgan and Fidelity, offered lower cost share classes for their target date funds included in the Plans, the performance of which was equal to the performance of the more expensive funds. This fiduciary failure decreased participant compounding

returns and reduced the available amount participants will have at retirement.

99.    As demonstrated on the charts below, even when Defendants chose a fund that was styled as a collective trust, which generally generate smaller expenses for participants (as explained below), they chose a collective trust that had an extra layer of undisclosed expenses built in, and as a result, incurred mutual fund level expenses.

100.   Additionally, during the Class Period, Defendants failed to consider materially similar but cheaper alternatives the Plans' investment options that represent the majority of their assets. This failure is a strong indication that Defendants lacked a prudent investment monitoring process.

## C.    Collective Trusts and Separate Accounts Should Cost Less Than Their Virtually Identical Mutual Fund Counterparts

101.   Plan fiduciaries such as Defendants must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further than mutual funds and provide lower fee alternatives than even institutional and defined benefit plan specific shares of mutual funds. Trust law specifically identifies "one or more suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments. Restatement (Third) of Trusts § 100 cmt. b(1)

34

(2012).

102.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot either advertise or issue formal prospectuses. As a result, their costs should be significantly lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, *Not Your Normal Nest Egg*, THE WALL STREET JOURNAL, March 2013.

103.    Due to their potential to reduce overall plan costs, collective trusts have become widely popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds). Indeed, as of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014).[16]

104.    Many of the criticisms leveled against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are

---

[16]    Available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (last visited April 25, 2021).

valued daily; as a result, participants invested in collective trusts can track the daily performance of their investments online. *See* Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, Employee Benefit News (Apr. 14, 2016) (herein, "CITs Gaining Ground").[17] Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Id*. In addition, because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the 401(k) plan has the same level of protection that the Investment Company Act provides to individual investors. Also, collective trusts are subject to state and federal banking regulations that provide comparable protections. American Bankers Association, *ABA Primer on Bank Collective Funds*, at 1 (June 2015).

105.   Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

106.   Separate accounts are widely available to large plans such as the 403(b) Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund. By using separate accounts,

---

[17]  Available at https://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (last visited April 25, 2021).

"[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998) (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").[18]

107.   Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts that do not have an extra built-in layer of fees, and in the majority of cases, will opt to move out of mutual funds.

**D.    Defendants Fail to Offer Either Prudently Selected Collective Trusts or Separate Accounts to the 403(b) Participants Even Though They Cost Less Than Their Virtually Identical Mutual Fund Counterparts.**

108.   Defendant offered two hundred and fifty (250) investment options in the 403(b) Plan, but not a single collective trust or separate account among them. *See* Form 5500s for 2015-2019 at Schedule H.

109.   Defendants clearly knew about the availability of collective trusts, as demonstrated by their selection of a collective trust as the target date fund option in

---

[18] Available at: https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (last visited April 25, 2021).

the 401(a) Plan, but utterly disregarded collective trusts as an option for the 403(b)

Plan. *See* Form 5500s for 2015-2019 at Schedule H. below. Furthermore, the 403(b)

Plan could have reaped considerable cost savings by using low-cost collective trusts

during the Class Period due to its size, with more than $500,000,000 in assets, but

Defendants failed to exercise their duty of care by offering even a single low cost

collective trust investment option for the 403(b) Plan.

### E. Defendants Offered Only a High-Cost Private Issue Collective Trust in the 401(a) Plan

110.    Although the 401(a) Plan has at all relevant times provided a collective

trust option, Defendants chose private issue collective trusts that charge expense

ratios similar to the expense ratios charged by retail mutual funds.

111.    The basic contours of the 401(a) Plan and the funds offered in the

401(a) Plan have been the same throughout the Class Period. The 401(a) Plan offers

a choice of a JPMorgan collective trust target date fund, a Vanguard money market

fund, and three (3) Vanguard index funds.

112.    For the entirety of the Class Period, the expense ratios of the JPMorgan

target date funds that Defendants selected for the 401(a) Plan were far higher than

alternative target date funds that the 401(a) Plan could and should have selected.

Defendants breached their fiduciary duties by failing to choose target date funds with

reasonable fees and for failing to continually monitor the investment management

fees of the target date funds that they chose to ensure that such fees were reasonable.

113.    For 2015, the JP Morgan SmartRetirement Target Date Fund C, offered by the 401(a), was one of the *most expensive* target date funds available in the marketplace, even though it was a collective trust.

114.    These JP Morgan target date funds are and were actively managed collective investment trusts.

115.    As shown in the chart below, the expense ratios for the JP JPMorgan SmartRetirement Target Date C funds were almost 100 basis points above the median expense ratios in the same category.

| Fund in Plan | Expense Ratio | Expense Based on $855,124 Assets[19] | Category | ICI Median |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2020, Class C[20] | 1.41 % | $1,205,724 | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2025, Class C | 1.44 % | $1,231,378 | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2030, Class C | 1.45 % | $1,239,929 | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2035, Class C | 1.45 % | $1,239,929 | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2040, Class C | 1.46 % | $1,248,481 | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2045, Class C | 1.46 % | $1,248,481 | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2050, Class C | 1.46 % | $1,248,481 | Target-Date | 0.47 % |
| JPMorgan SmartRetirement 2055, Class C | 1.46 % | $1,248,481 | Target-Date | 0.47 % |
|  |  |  |  |  |

116.    The above comparisons greatly understate the excessiveness of fees in the 401(a) Plan throughout the Class Period because the ICI Median fee shown above is based on a study conducted in 2016 when expense ratios were generally higher than fees today, given the downward trend of expense ratios over the last ten

---

[19] Calculation based on formula in 401(a) June 30, 2020 Fee Disclosure.
[20] The "Class C" funds were the target date fund option for the 401(a) Plan before 2016.

years. Indeed, the ICI median expense ratio for target date funds for plans with over $1 billion in assets was 0.56% using 2015 data compared with 0.47% in 2016. Accordingly, median expense ratios since 2016 would be lower than indicated above, demonstrating a greater disparity between the Plan's 2018 expense ratios recited above and the median expense ratios in the same category.

117.    Furthermore, the median-based comparisons above also understate the excessiveness of the investment management fees of the Plans' funds because many prudent alternative funds were available that offered lower expenses than the median. For example, JPMorgan introduced the JPMorgan SmartRetirement Blend R6 target date funds in 2012. The current expense ratios for those funds are 0.19%. *See* [JPMorgan SmartRetirement Blend 2020 Fund-R6 | J.P. Morgan Asset Management](last visited March 14, 2021).

118.    In 2016, Defendants transitioned the target date fund selection to the JPMorgan Target Date CF-B, which, though less expensive than the JPMorgan Target Date Fund C, still charges unreasonably high expenses.

119.    The JPMorgan Target Date CF-B invests in 26 different underlying JPMorgan collective trusts that do not disclose the individually negotiated fees. While the 401(a) Fee Disclosures report an expense ratio of 36 – 49 bps for the JPMorgan Target Date Funds CF-B[21] and the prospectus for the JPMorgan Target

---

[21] Notices of Investment Returns & Fee Comparison for periods ending September

Date Funds reports those as AFFE (Acquired Fund Fees and Expenses), the total fees for these investments are opaque as the total fees can only be discerned by reviewing the return and bps of each underlying JPMorgan collective trust investment, which are not publicly available.

120.    In 2018 alone, *over $1 billion* of 401(a) Plan assets were invested in this private issue collective trust target date fund offered by JPMorgan. As shown on the 401(a) Notice of Investment Returns & Fee Comparisons dated June 2020, the JPMorgan target date funds had the following expense ratios:

| Fund in Plan | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement Income Fund CF-B Class | 0.36% | 0.36% | 0.36% | 0.37% | -- |
| JPMorgan SmartRetirement 2020 CF-B Class | 0.40% | 0.40% | 0.42% | 0.47 | -- |
| JPMorgan SmartRetirement 2025 CF-B Class | 0.46% | 0.46% | 0.48% | 0.52% | 0.57% |
| JPMorgan SmartRetirement 2030 CF-B Class | 0.47% | 0.47% | 0.50% | 0.55 % | 0.59% |
| JPMorgan SmartRetirement, 2035 CF-B Class | 0.48% | 0.48% | 0.51% | 0.57% | 0.61% |
| JPMorgan SmartRetirement 2040 CF-B Class | 0.48% | 0.48% | 0.51% | 0.58% | 0.63% |
| JPMorgan SmartRetirement 2045 CF-B Class | 0.48% | 0.48% | 0.51% | 0.58% | 0.63% |
| JPMorgan SmartRetirement 2050 CF-B Class | 0.48% | 0.48% | 0.51% | 0.59% | 0.635% |
| JPMorgan SmartRetirement 2055 CF-B Class | 0.49% | 0.49% | 0.52% | 0.64% | 0.63% |
| JPMorgan SmartRetirement 2060 CF-B Class | 0.04% | 0.51% | 1.72% | 0.60% | -- |

121.    A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available lower cost target funds, whether collective trusts or not. As demonstrated in the chart below, the

30, 2019 and June 30, 2020 ("401(a) Fee Disclosures").

private label collective trusts Defendants selected have **much higher expense ratios than target date funds offered by the same issuer but in other fund families throughout the Class Period**. A prudent fiduciary conducting an impartial review of the 401(a) Plan's investments would have identified these lower cost target date funds at the earliest opportunity.

| Fund in Plan | Expense Ratio[22] | Lower Cost Alternatives | Expense Ratio for 2019 & 2021[23] | % Fee Excess for 2019 & 2021 | Expense Differential for 2019 based on $1,117,526,467 in Assets[24] |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement DRE Income CF-B Class | 0.36% | JIYBX JPMorgan SmartRetirement Income Blend | 0.29% | 24% | $506,739 vs. $408,207 |
| | | | 0.19% | 89% | |
| JPMorgan SmartRetirement DRE 2020 CF-B Class | 0.40% | JSYRX JPMorgan SmartRetirement Blend 2020 R6 | 0.29% | 38% | $920,362 vs. $667,262 |
| | | | 0.19% | 110% | |
| JPMorgan SmartRetirement DRE 2025 CF-B Class | 0.46% | JBYSX JPMorgan SmartRetirement Blend 2025 R6 | 0.29% | 59% | $1,122,180 vs. $707,461 |
| | | | 0.19% | 142% | |
| JPMorgan SmartRetirement DRE 2030 CF-B Class | 0.47% | JRBYX JPMorgan SmartRetirement | 0.29% | 62% | $947,424 |

---

[22] Per 401(a) 2020 Fee Disclosure.

[23] The top value is for 2019-2020. The bottom value illustrates that the expense ratio for the lower cost share class continues to fall as the undated price listed on Morningstar as of March 2021 is only 0.19%.

[24] $1,117,000 is the value reported for JPMorgan SmartRetirement CF-B investments on Form 5500 for yr. end 2019. *See* 2019 Form 5500, Notes to Financial Statement, page 11. Calculation of top expense number is based on Fee disclosure of $4.00 per $1,000 in assets.

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | Blend 2030 R6 | 19% | 147% | vs.<br><br>$584,581 |
| JPMorgan SmartRetirement DRE 2035 CF-B Class | 0.48% | JPYRX<br>JPMorgan SmartRetirement Blend 2035 R6 | 0.29%<br><br>19% | 66%<br><br>153% | $825,113<br>vs.<br>$498,506 |
| JPMorgan SmartRetirement DRE 2040 CF-B Class | 0.48% | JOBYX<br>JPMorgan SmartRetirement Blend 2040 R6 | 0.29%<br><br>19% | 66%<br><br>153% | $674,499<br>vs.<br>$407,509 |
| JPMorgan SmartRetirement DRE 2045 CF-B Class | 0.48% | JMYAX<br>JPMorgan SmartRetirement Blend 2045 R6 | 0.29%<br><br>19% | 66%<br><br>153% | $471,473<br>vs.<br>$284,848 |
| JPMorgan SmartRetirement DRE 2050 CF-B Class | 0.48% | JNYAX<br>JPMorgan SmartRetirement Blend 2050 R6 | 0.29%<br><br>0.19% | 66%<br><br>153% | $279.661<br>vs.<br>$168.962 |
| JPMorgan SmartRetirement DRE 2055 CF-B Class | 0.49% | JTBBX<br>JPMorgan SmartRetirement Blend 2055 R6 | 0.29%<br><br>0.19% | 66%<br><br>158% | $112,421<br>vs.<br>$66,634 |
| JPMorgan SmartRetirement DRE 2060 CF-B Class | 0.04% | JAAYX<br>JPMorgan SmartRetirement Blend 2060 R6 | 0.29%<br><br>0.19% | N/A | N/A |

122.   The table above is for illustrative purposes only as the significant fee disparities detailed herein existed throughout the Class Period. The 401(a) Plan's expense ratios were multiples of what they should have been given the 401(a) Plan's bargaining power, which Defendants failed to utilize adequately for the benefit of the 401(a) Plan and its participants. Indeed, as illustrated on the chart below, a

43

prudent investigation would have revealed the existence of numerous lower-cost and comparable or better performing alternatives to the 401(a) Plan's target date funds. *See* Performance Chart at ¶123.

123.   These target date funds also did not generate higher returns than the benchmark indices against which JP Morgan measures the performance of its own target date funds.

| IN PLAN OPTION[25] | Net Expense Ratio | Average Annual Return (%) | | Performance Relative to Benchmark (%) | |
|---|---|---|---|---|---|
| | | 1Y | 5Y | 1Y | 5Y |
| JPMorgan SmartRetirement Income CF-B Class Benchmark: S & P target Date Retirement Income TR USD | 0.36% | 3.07 | 4.67 | -2.33 | -0.03 |
| JPMorgan SmartRetirement 2020 CF-B Class Benchmark: S & P target Date 2020 Retirement Income TR USD | 0.40% | 3.10 | 8.01 | -1.23 | -0.35 |
| JPMorgan SmartRetirement 2025 CF-B Class Benchmark: S & P target Date 2025 Retirement Income TR USD | 0.46% | 2.64 | 5.52 | -1.02 | -.30 |
| JPMorgan SmartRetirement 2030 CF-B Class Benchmark: S & P target Date 2030 Retirement Income TR USD | 0.47% | 1.71 | 5.74 | -1.21 | -0.28 |
| JPMorgan SmartRetirement 2035 CF-B Class Benchmark: S & P target Date 2035 Retirement Income TR USD | 0.48% | 1.97 | 5.85 | -0.15 | -.32 |
| JPMorgan SmartRetirement 2040 CF-B Class Benchmark: S & P target Date 2040 Retirement Income TR USD | 0.48% | 1.41 | 6.05 | -0.15 | -0.24 |

---

[25] All values, including designated benchmark are as per June 30, 2020 Fee Disclosure.

| | | | | | |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2045 CF-B Class<br>Benchmark: S & P target Date 2045 Retirement Income TR USD | 0.48% | 0.97 | 5.98 | -0.23 | -0.36 |
| JPMorgan SmartRetirement 2050 CF-B Class<br>Benchmark: S & P target Date 2050 Retirement Income TR USD | 0.48% | 0.88 | 5.93 | -0.17 | -0.49 |
| JPMorgan SmartRetirement 2055 CF-B Class<br>Benchmark: S & P target Date 2055 Retirement Income TR USD | 0.49% | 0.97 | 5.93 | 0.08 | -0.52 |
| JPMorgan SmartRetirement 2060 CF-B Class<br>Benchmark: S & P target Date 2055 Retirement Income TR USD | 0.04% | 0.67 | ___ | -0.22 | ___ |

**F.      Defendants Burdened the 403(b) Plan with Expensive, Underperforming Funds and Failed to Investigate and Select the Lowest Cost Share Class of Numerous Funds in the Plan**

124.    As set forth above, the 403(b) Plan offered 250 different funds, including two target date funds, the JPMorgan SmartRetirement target date R6 funds and the Fidelity Freedom K funds and a plethora of other over-priced and under-performing funds. Form 5500 for 2018 at Schedule H.

125.    According to the Form 5500 for December 31, 2018, 403(b) Plan Participants invested more than $276,408,504 in the JPMorgan SmartRetirement target date R6 funds and $64,360,630 in the Fidelity Freedom K funds. As a result, almost 40% of the 403(b) Plan's assets were invested in these two series of target date funds.

126.    The chart below shows that the expense ratios of the Plan's investment

45

options were many times greater than comparable funds in the same fund family and the same fund category. The chart below analyzes both the JPMorgan SmartRetirement funds and the Fidelity Freedom K funds using current expense ratios and performance metrics as compared to: (a) a lower cost share class target date fund by the same issuer; and (b) other lower cost target date funds in order to demonstrate that the Plan and its participants received nothing of value in exchange for the greater expenses of the Plan's funds.

127.    To add to participants' confusion, Defendants inexplicably offered 403(b) Plan Participants two different series of target date funds, when it would have made much more sense – and been far less confusing – to have offered a single well-preforming target date fund with a reasonable expense ratio of 0.12%, such as the Fidelity Freedom Index Fund Investor.

128.    The alternative funds, set forth in the chart below in ¶129, outperformed the 403(b) Plans' funds in their 3- and 5-year average returns as of the quarter ending June 2020. Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

129.    Defendants compounded the imprudence of selecting these high expense target date funds by making them the default investment for new

participants in the 403(b) Plan, thereby assuring that a significant percentage of the

403(b) Fund's assets would be invested in these expensive target date funds.

| IN PLAN OPTION[26] | Net Expense Ratio | Average Annual Return (%) | | | | Benchmark Relative (%) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| JTTYX JPMorgan SmartRetirement® 2020 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD[27] | 0.41% | 10.48 | 6.65 | 7.95 | 7.25 | -2.83 | -1.89 | -1.25 | -0.38 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSBOX State Street Target Retirement 2020 K[28] | 0.09% | 11.68 | 7.95 | 8.91 | — | -1.64 | -0.58 | -0.29 | — |
| VTWNX Vanguard Target Retirement 2020 Inv | 0.13% | 12.04 | 8.07 | 9.02 | 7.93 | -1.28 | -0.47 | -0.18 | 0.30 |
| TLWPX TIAA-CREF Lifecycle Index 2020 Premier | 0.25% | 12.91 | 8.52 | 9.08 | 7.95 | -0.41 | -0.01 | -0.11 | 0.32 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| JNSYX JPMorgan SmartRetirement® 2025 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.43% | 11.89 | 7.48 | 8.95 | 8.05 | -1.77 | -1.38 | -0.93 | -0.17 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSBSX State Street Target Retirement 2025 K | 0.09 % | 14.84 | 9.44 | 10.53 | -- | 1.18 | 0.57 | 0.65 | -- |
| VTTVX Vanguard Target Retirement 2025 Inv | 0.13 % | 13.30 | 8.73 | 9.88 | 8.54 | -0.37 | -0.13 | — | 0.32 |
| TLVPX TIAA-CREF Lifecycle Index 2025 Premier | 0.25 % | 13.80 | 9.05 | 9.86 | 8.57 | 0.13 | 0.19 | -0.02 | 0.34 |

[26] All performance metrics are as of September 30, 2020.

[27] This fund is the benchmark for all of the JPMorgan SmartRetirement® R6 funds and the proposed lower-cost alternative.

[28] Inception date 9/30/14. Fact Sheet: State Street Target Retirement 2020 Fund, Dec2020 (ssga.com).

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| JSMYX JPMorgan SmartRetirement® 2030 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.44% | 12.74 | 8.01 | 9.76 | 8.62 | -0.95 | -1.07 | -0.82 | -0.16 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSBYX State Street Target Retirement 2030 K | 0.09 % | 17.24 | 10.44 | 11.52 | -- | 3.55 | 1.35 | 0.94 | -- |
| | | | | | | | | | |
| VTHRX Vanguard Target Retirement 2030 Inv | 0.14 % | 14.10 | 9.16 | 10.51 | 9.04 | 0.41 | 0.07 | -0.07 | 0.26 |
| TLHPX TIAA-CREF Lifecycle Index 2030 Premier | 0.25 % | 14.63 | 9.60 | 10.63 | 9.20 | 0.94 | 0.51 | 0.04 | 0.41 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| SRJYX JPMorgan SmartRetirement® 2035 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.45% | 14.45 | 8.63 | 10.48 | 9.18 | 1.07 | -0.50 | -0.66 | 0.01 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSCKX State Street Target Retirement 2035 K | 0.09 % | 18.19 | 10.82 | 12.09 | -- | 4.81 | 1.68 | 0.95 | -- |
| VTTHX Vanguard Target Retirement 2035 Inv | 0.14 % | 14.79 | 9.50 | 11.11 | 9.51 | 1.41 | 0.37 | -0.03 | 0.33 |
| TLYPX TIAA-CREF Lifecycle Index 2035 Premier | 0.25 % | 15.42 | 10.09 | 11.36 | 9.79 | 2.03 | 0.95 | 0.22 | 0.62 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| SMTYX JPMorgan SmartRetirement® 2040 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.46% | 15.20 | 9.05 | 11.07 | 9.54 | 2.11 | -0.05 | -0.41 | 0.20 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSCQX State Street Target Retirement 2040 K | 0.09 % | 18.79 | 11.05 | 12.48 | -- | 5.70 | 1.95 | 1.00 | -- |
| VFORX Vanguard Target Retirement 2040 Inv | 0.14 % | 15.47 | 9.85 | 11.71 | 9.90 | 2.38 | 0.74 | 0.23 | 0.56 |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| TLPRX TIAA-CREF Lifecycle Index 2040 Premier | 0.25 % | 16.11 | 10.51 | 12.05 | 10.26 | 3.01 | 1.40 | 0.57 | 0.92 |
| JSAYX JPMorgan SmartRetirement® 2045 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.46% | 15.64 | 9.31 | 11.27 | 9.65 | 2.69 | 0.27 | -0.34 | 0.32 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSDEX State Street Target Retirement 2045 K | 0.09 % | 19.28 | 11.28 | 12.85 | -- | 6.33 | 2.24 | 1.24 | -- |
| VTIVX Vanguard Target Retirement 2045 Inv | 0.15 % | 16.30 | 10.20 | 12.09 | 10.09 | 3.35 | 1.16 | 0.48 | 0.76 |
| TLMPX TIAA-CREF Lifecycle Index 2045 Premier | 0.25 % | 16.81 | 10.91 | 12.49 | 10.48 | 3.86 | 1.88 | 0.89 | 1.15 |
| JTSYX JPMorgan SmartRetirement® 2050 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.46% | 15.59 | 9.30 | 11.24 | 9.64 | 2.68 | 0.34 | -0.38 | 0.39 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSDLX State Street Target Retirement 2050 K | 0.09% | 19.76 | 11.45 | 12.93 | -- | 6.85 | 2.49 | 1.32 | -- |
| VFIFX Vanguard Target Retirement 2050 Inv | 0.15% | 16.39 | 10.24 | 12.10 | 10.09 | 3.48 | 1.28 | 0.48 | 0.85 |
| TLLPX TIAA-CREF Lifecycle Index 2050 Premier | 0.25% | 17.00 | 11.00 | 12.65 | 10.56 | 4.09 | 2.04 | 1.03 | 1.31 |
| JFFYX JPMorgan SmartRetirement® 2055 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.45% | 15.59 | 9.31 | 11.26 | -- | 2.68 | 0.43 | -0.35 | -- |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| SSDQX State Street Target Retirement 2055 K | 0.09% | 19.65 | 11.46 | 12.96 | -- | 6.75 | 2.57 | 1.35 | -- |

| | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| VFFVX Vanguard Target Retirement 2055 Inv | 0.15% | 16.32 | 10.22 | 12.09 | 10.10 | 3.41 | 1.34 | 0.48 | 0.97 |
| TTIPX TIAA-CREF Lifecycle Index 2055 Premier | 0.25 % | 17.08 | 11.04 | 12.76 | -- | 4.17 | 2.16 | 1.16 | -- |
| **IN PLAN OPTION** | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| JAKYX JPMorgan SmartRetirement® 2060 R6 Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.44% | 15.48 | 9.32 | -- | -- | 2.59 | 0.51 | -- | -- |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| SSDYX State Street Target Retirement 2060 K | 0.09% | 19.63 | 11.42 | 12.89 | - | 6.73 | 2.62 | 1.32 | - |
| VTTSX Vanguard Target Retirement 2060 Inv | 0.15% | 16.32 | 10.22 | 12.08 | - | 3.43 | 1.42 | 0.51 | - |
| TVIPX TIAA-CREF Lifecycle Index 2060 Premier | 0.25% | 17.21 | 11.14 | 12.89 | - | 4.32 | 2.34 | 1.31 | - |

130.   In addition to the under-performing target date funds in the 403(b) Plan, Defendants offered approximately two hundred other investment options, including numerous over-priced and under-performing funds.

131.   An analysis of seventeen of the funds in which $112,813,931 of the 403(b) Plan's assets were invested demonstrates that many of these funds should never have been offered in the 403(b) Plan, or that prudent monitoring would have caused Defendants to remove the funds from the Plan.

132.   Below is a Performance Chart which demonstrates the imprudence of many of the investments in the 403(b) Plan by comparing the performance of 17 of the offered investments to their benchmarks and the performance of lower-cost alternative funds that use the same benchmarks.

133.   As illustrated below, among the Plan's perennially underperforming investment options include the ClearBridge Aggressive Growth A, ClearBridge Mid Cap A, and ClearBridge All Cap Value A, which have expense ratios greater than 1.00%, as compared to comparable funds that use the same benchmark index to track performance, such as Blackrock Capital Apprec. K Fund, which has an expense ratio of 0.65% (*i.e.*, 100% difference). Such excessive fees alone make the Clearbridge investments, in which Participants invested more than thirty-five million dollars ($35,000,000), imprudent. However, the imprudence of the ClearBridge funds is exacerbated by their poor performance relative to their benchmark indices, as well as far less expensive funds that use the same benchmark index to track performance that were readily available to the Plan throughout the Class Period, like the Vanguard Mid Cap Index Instit., with an expense ratio of 0.04% and better performance than the ClearBridge Mid Cap A Revenue over the 1-, 3-, 5- and 10-year periods ending on June 30, 2020. Given such high expenses and prolonged underperformance, it was imprudent for Defendants to retain these ClearBridge funds as investment options in the Plan.

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | SHRAX $13,592,059 ClearBridge Aggressive Growth A Revenue Share: Min. 0.25% Benchmark Index: Russell 1000 Growth | 1.12% | 19.47 | 10.94 | 10.52 | 12.12 | -19.03 | -12.05 | -10.48 | -5.09 |
| *Lower Fee Alternative* | SAGYX ClearBridge Aggressive Growth I | 0.81% | 19.86 | 11.29 | 10.88 | 12.50 | -18.64 | -11.69 | -10.13 | -4.70 |
| *Low Fee Alternative[29]* | MAFOX BlackRock Large Cap Focus Grw I | 0.67% | 46.84 | 25.89 | 21.14 | 16.23 | 8.35 | 2.90 | 0.14 | -0.98 |
| *Low Fee Alternative* | BFGBX BlackRock Capital Appreciation K | 0.65% | 40.59 | 23.85 | 20.41 | 15.25 | 2.10 | 0.86 | -0.59 | -1.96 |
| *Low Fee Alternative* | VHCAX Vanguard Capital Opportunity Inv | 0.37% | 22.89 | 14.63 | 16.58 | 15.36 | -15.61 | -8.35 | -4.42 | -1.84 |

---

[29] The performance of all suggested low fee alternatives is shown relative to the same benchmark noted for the in-plan fund.

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | SBMAX $ 4,858,756 ClearBridge Mid Cap A Revenue Share: 0.25 % Benchmark Index: Russell Mid Cap | 1.18% | 16.11 | 10.32 | 10.41 | 10.95 | -0.99 | -1.28 | -2.99 | -1.47 |
| Lower Fee Alternative | SMBYX ClearBridge Mid Cap I | 0.85% | 16.47 | 10.68 | 10.78 | 11.34 | -0.64 | -0.92 | -2.62 | -1.08 |
| Low Fee Alternative | VMCIX Vanguard Mid Cap Index Instl. | 0.04% | 18.26 | 12.04 | 13.29 | 12.41 | 1.16 | 0.44 | -0.10 | ___ |
| Low Fee Alternative | FSMAX Fidelity Extended Market Index | 0.46% | 32.16 | 15.31 | 16.05 | 13.16 | 15.06 | 3.71 | 2.65 | 0.74 |
| Low Fee Alternative | VIEIX Vanguard Extended Market Index Inst. | 0.05% | 32.23 | 15.35 | 16.06 | 13.24 | 15.13 | 3.74 | 2.66 | 0.82 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | SHFVX $ 3,993,402 ClearBridge All Cap Value A Revenue Share: 0.25 % Benchmark Index: Russell 1000 Value | 1.16% | -1.16 | 1.09 | 7.33 | 7.26 | -3.95 | -4.98 | -2.41 | -3.25 |
| Lower Fee Alternative | SFVYX ClearBridge All Cap Value I | 0.81% | -0.76 | 1.46 | 7.73 | 7.70 | -3.56 | -4.61 | -2.01 | -2.81 |
| Low Fee Alternative | AMRMX American Funds American Mutual R6 | 0.27% | 5.10 | 8.02 | 11.24 | 11.03 | 2.30 | 1.96 | 1.50 | 0.53 |

| Low Fee Alternative | MADVX Blackrock Equity Dividend Instl | 0.71% | 3.93 | 7.15 | 10.79 | 10.45 | 1.13 | 1.08 | 1.05 | -0.06 |
| Low Fee Alternative | YACKX AMG Yacktman I | 0.75% | 15.28 | 11.68 | 12.86 | 11.39 | 12.49 | 5.61 | 3.12 | 0.88 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | SBLGX $7,732,358 ClearBridge Large Cap Grw. A Revenue Share: 0.25 % Benchmark Index: Russell 1000 Growth | 0.81% | 30.83 | 19.75 | 18.07 | 16.50 | -7.67 | -3.24 | -2.93 | -0.71 |
| Lower Fee Alternative | SBLYX ClearBridge Large Cap Growth I | 0.75% | 31.18 | 20.09 | 18.42 | 16.89 | -7.32 | -2.90 | -2.59 | -0.32 |
| Low Fee Alternative | MKFOX Blackrock Large Cap Focus Growth K | 0.62% | 46.75 | 25.95 | 21.17 | 16.24 | 8.25 | 2.96 | 0.17 | -0.97 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | SINAX $ 5,430,946 ClearBridge Large Cap Value A Benchmark Index: Russell 1000 Value | 0.88% | 5.70 | 7.25 | 9.69 | 10.62 | 2.90 | 1.18 | -0.05 | 0.12 |
| Lower Fee Alternative | SAIFX ClearBridge Large Cap Value I | 0.53% | 5.96 | 7.55 | 10.00 | 10.96 | 3.17 | 1.48 | 0.26 | 0.45 |
| Low Fee Alternative | AMRMX American Funds American Mutual R6 | 0.27% | 5.10 | 8.02 | 11.24 | 11.03 | 2.30 | 1.96 | 1.50 | 0.53 |

| Low Fee Alternative | YACKX AMG Yacktman I | 0.75% | 15.28 | 11.68 | 12.86 | 11.39 | 12.49 | 5.61 | 3.12 | 0.88 |

134.    Another perennial underperforming investment option, the American Funds Europacific Growth A, which has an unreasonably high expense ratio of 0.83%, as compared to comparable funds that use the same benchmark index to track performance, such as the Vanguard International Growth fund, which has an expense ratio of 0.43% (*i.e.*, a 100% difference). Such excessive fees alone make this investment imprudent. However, the imprudence of this fund is exacerbated by its poor performance relative to its benchmark index (MSCI ACWI Ex USA Growth NR USD), as well as the performance of far less expensive funds that use the same benchmark index to track performance that were readily available to the Plan throughout the Class Period, like the Vanguard International Growth fund, which had far better performance than the Clearbridge Aggressive Growth A Fund over the 1-, 3-, 5- and 10-year periods ending on June 30, 2020. Given such high expenses and prolonged underperformance, it was imprudent for Defendants to select and retain the ClearBridge Aggressive Growth A as an investment option in the Plan.

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | AEPGX $11,871,312 American Funds Europacific Growth A Revenue Share: 0.24% Benchmark Index: MSCI ACWI Ex USA Growth | 0.84% | 24.80 | 10.34 | 12.07 | 7.77 | 2.60 | 0.33 | 0.10 | 0.83 |
| Low Fee Alternative | RERGX American Funds Europacific Growth R6 | 0.46% | 25.27 | 10.74 | 12.47 | 8.14 | 3.06 | 0.72 | 0.49 | 1.21 |
| Low Fee Alternative | VWILX Vanguard Internat'l Growth Adm | 0.33% | 103.99 | 19.97 | 22.86 | 12.48 | 61.14 | 9.96 | 10.01 | 5.32 |

135.  Another cluster of perennially underperforming investments were managed by MFS, whose funds that were included in the Plan had expense ratios between 0.70% and 0.82% and attracted over $27,000,000 in participants' assets. For two of the three MFS funds, comparable funds that use the same benchmark index to track performance with expense ratios as low as 0.03% and which out-performed the MFS funds were easily located. Such excessive fees alone make these investments imprudent. However, the imprudence of the MFS Total Return A, which has an unreasonably high expense ratio of 0.73%, is exacerbated by its poor performance relative to its benchmark index (Morningstar Mod Tgt Risk TR USD), as well as the better performance of far less expensive funds that use the same

benchmark index to track performance that were readily available to the Plan throughout the Class Period. For example, the MFS Total Return A is out-performed by between 28% and 350% by the Vanguard Balanced Inv., which has an expense ratio of 0.07% - 10% of the expenses charged by the MFS Fund, before revenue sharing is considered. Given such high expenses and prolonged underperformance, it was imprudent for Defendants to retain the MFS funds as investment options in the Plan.

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | MSFRX $14,562072 MFS Total Return A Revenue Share: 0.25 % Benchmark Index: Morningstar Mod Tgt Risk | 0.73% | 9.71 | 7.50 | 8.69 | 8.23 | -3.11 | -1.04 | -1.05 | 0.47 |
| Lower Fee Alternative | MSFJX MFS Total Return R4 | 0.48% | 9.91 | 7.78 | 8.95 | 8.50 | -2.91 | -0.77 | -0.80 | 0.73 |
| Low Fee Alternative | VWENX Vanguard Wellington Adm. | 0.17 | 10.68 | 9.46 | 10.84 | 9.95 | -2.14 | 0.92 | 1.09 | 2.18 |
| Low Fee Alternative | VBIAX Vanguard Balanced Index Inv | 0.07% | 16.40 | 11.26 | 11.27 | 9.98 | 3.58 | 2.71 | 1.53 | 2.21 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | MITTX $8,107,543 **MFS Massachusetts Investors Tr A** Revenue Share: 0.25 % Benchmark Index: Russell 1000 | 0.71% | 14.12 | 12.54 | 13.89 | 12.65 | -6.84 | -2.28 | -1.71 | -1.36 |
| *Lower Fee Alternative* | MITJX **MFS Massachusetts Investors Tr R6** | 0.380% | 14.50 | 12.90 | 14.25 | 12.95 | -6.64 | -1.92 | -1.35 | -1.06 |
| *Low Fee Alternative* | DFUSX **DFA US Large Company I** | 0.080% | 18.40 | 14.14 | 15.16 | 13.82 | -2.57 | -0.68 | -0.43 | -0.19 |
| *Low Fee Alternative* | FXAIX **Fidelity 500 Index** | 0.015% | 18.40 | 14.17 | 15.21 | 13.87 | -2.57 | -0.65 | -0.39 | -0.14 |
| *Low Fee Alternative* | SWPPX **Schwab S&P 500 Index** | 0.02% | 18.39 | 14.15 | 15.16 | 13.81 | -2.57 | -0.67 | -0.43 | -0.20 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | MEIAX $ 5,479,410 **MFS Value A** Revenue Share: 0.25 % Benchmark Index: Russell 1000 Value | 0.82% | 3.66 | 6.54 | 10.09 | 10.76 | 0.87 | 0.48 | 0.35 | 0.26 |
| *Lower Fee Alternative* | MEIKX **MFS Value R6** | 0.47% | 4.03 | 6.91 | 10.47 | 11.13 | 1.23 | 0.84 | 0.73 | 0.63 |
| *Low Fee Alternative* | RMFGX **American Funds American Mutual R6** | 0.27% | 5.10 | 8.02 | 11.24 | 11.03 | 2.30 | 1.96 | 1.50 | 0.53 |

136.   Also, among the most expensive investment options in the Plan were under-performing Invesco Oppenheimer ("Invesco") mutual funds. These funds attracted tens of millions of dollars of Participants' investments, but charged

excessive expense ratios between 1.05% and 1.30%. For each of the Plan's three Invesco funds, comparable funds that use the same benchmark index to track performance with lower expense ratios between 0.36% and 0.65% and which out-performed the Invesco funds were to the Plan throughout the Class Period.

137.   Such excessive fees alone make these investments imprudent. However, the imprudence of the Invesco Oppenheimer International Growth A, which has an unreasonably high expense ratio of 1.10%, is exacerbated by its poor performance relative to its benchmark index (MSCI ACWI Ex USA Growth NR USD), as well as the better performance of far less expensive funds that use the same benchmark index to track performance that were readily available to the Plan throughout the Class Period. For example, the Invesco Oppenheimer International Growth A is out-performed by between approximately 150% and 450% by the Vanguard International Growth Adm., which has an expense ratio of 0.43% - less than 40% of the expenses charged by the Invesco fund, before revenue sharing is considered. Given such high expenses and prolonged underperformance, it was imprudent for Defendants to select and retain the Invesco funds set forth above in ¶136 as investment options in the Plan.

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | OIGAX $4,718,361 Invesco Oppenheimer Internat'l Gr A Revenue Share: 0.25 % Benchmark Index: MSCI ACWI Ex USA Growth | 1.13% | 21.91 | 8.05 | 9.30 | 7.69 | -0.29 | -1.97 | -2.67 | 0.75 |
| *Lower Fee Alternative* | OIGIX Invesco Oppenheimer International Gr R6 | 0.69% | 22.40 | 8.49 | 9.76 | 8.11 | 0.20 | -1.52 | -2.21 | 1.17 |
| *Low Fee Alternative* | VWILX Vanguard Internat'l Growth Adm | 0.33% | 103.99 | 19.97 | 22.86 | 12.48 | 61.14 | 9.96 | 10.01 | 5.32 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | QVGIX $3,683,997 Invesco Oppenheimer Global Allocation A Revenue Share: 0.25 % Benchmark Index: Morningstar Gbl Allocation | 1.35% | 14.42 | 6.32 | 7.65 | 5.69 | 0.87 | -2.00 | -2.11 | -1.53 |
| *Low Fee Alternative* | QGRIX Invesco Oppenheimer Global Allocation R6 | 0.90% | 14.94 | 6.79 | 8.12 | 6.11 | 1.39 | -1.53 | -1.64 | -1.11 |
| *Low Fee Alternative* | TGAFX T. Rowe Price Global Allocation I | 0.85% | 14.90 | 8.58 | 9.89 | ___ | 1.36 | 0.26 | 0.13 | __ |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | OPTFX $6,631,954 Invesco Oppenheimer | 1.00% | 36.29 | 20.36 | 16.59 | 13.98 | -2.21 | -2.62 | -4.41 | -3.23 |

|  |  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Cap. Apprec A Revenue Share: 0.25 % Benchmark Index: Russell 1000 Growth TR USD |  |  |  |  |  |  |  |  |  |
| *Low Fee Alternative* | OPTIX Invesco Oppenheimer Cap. Apprec R6 | 0.67% | 36.76 | 20.93 | 17.12 | 14.44 | -1.73 | -2.05 | -3.88 | -2.77 |
| *Low Fee Alternative* | BFGBX BlackRock Cap. Apprec K | 0.65% | 40.59 | 23.85 | 20.41 | 15.25 | 2.10 | 0.86 | -0.59 | -1.96 |
| *Low Fee Alternative* | MAFOX Blackrock Large Cap Focus Grw. I | 0.67% | 46.84 | 25.89 | 21.14 | 16.23 | 8.35 | 2.90 | 0.14 | -0.98 |

138.   Upon information and belief, Fidelity played a role in the selection of the Plan's investments and it made sure that the Plan was loaded with its own mediocre and expensive mutual funds. As of December 31, 2018, $337,110,325 of the Fund's assets were invested in Fidelity mutual funds, with more than twenty-five million ($25,000,000) invested in the five (5) funds highlighted below in ¶139, three of the five with expense ratios exceeding 0.96%.[30] For each of these five Fidelity funds, comparable funds that use the same benchmark index to track performance with much lower expense ratios and which out-performed the Fidelity funds were readily available to the Plan throughout the Class Period.

139.   Such excessive fees alone make these investments imprudent. However, the imprudence of these funds is exacerbated by their poor performance

---

[30] The 403(b) Plan also offered seven (7) money market funds which held more than $46,000,000 in assets as of December 31, 2018. The imprudence of including these money market funds as investment options is addressed in IX.G., below.

relative to their benchmark indices, as well as the better performance of far less expensive funds that use the same benchmarks to track performance that were readily available throughout the Class Period. For example, the Fidelity Advisor Stock Select Mid Cap, which has an expense ratio of 1.39%, is out-performed by between approximately 20%-100% by the Vanguard Extended Market Index Inst., which has an expense ratio of 0.05% - less than 4% of the expenses charged by the Fidelity fund, before revenue sharing is considered. Given such high expenses and easily matched performance, it was imprudent for Defendants to select and retain the Fidelity funds set forth above in below as investment options in the Plan.

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | FASMX $4,266,138 Fidelity Asset Manager 50%Benchmark: 40% SPY, 60% AGG Composite | 0.64% | 14.72 | 8.68 | 9.28 | 7.51 | 2.86 | 0.89 | 1.11 | 1.05 |
| Low Fee Alternative | VTMFX Vanguard Tax-Managed Balanced Adm | 0.09% | 13.30 | 9.64 | 9.48 | 8.99 | 1.44 | 1.85 | 1.31 | 2.53 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | FMCAX $7,902,809 Fidelity Advisor Stock Select Mid Cp M Rev. Share: 0.50 % Benchmark Index: Russell Mid Cap TR USD | 1.38% | 12.50 | 9.74 | 11.72 | 10.47 | -4.60 | -1.87 | -1.68 | -1.94 |

| | Fund | Net Expense Ratio | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Low Fee Alternative | FMCCX Fidelity Advisor Stock Select Mid Cp I | 0.90% | 13.06 | 10.27 | 12.26 | 10.99 | -4.04 | -1.34 | -1.13 | -1.42 |
| Low Fee Alternative | VMCIX Vanguard Mid Cap Index Instl | 0.04% | 18.26 | 12.04 | 13.29 | 12.41 | 1.16 | 0.44 | -0.10 | -0.00 |
| Low Fee Alternative | FSMAX Fidelity Extended Market Index | 0.46% | 32.16 | 15.31 | 16.05 | 13.16 | 15.06 | 3.71 | 2.65 | 0.74 |
| Low Fee Alternative | VIEIX Vanguard Extended Market Index Instit. | 0.05% | 32.23 | 15.35 | 16.06 | 13.24 | 15.13 | 3.74 | 2.66 | 0.82 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | FSIAX $10,589,097 Fidelity Advisor Strategic Income M Revenue Share: 0.25 % Benchmark Index: BBgBarc US Universal TR USD | 0.96% | 7.26 | 4.86 | 6.17 | 4.70 | -0.32 | -0.59 | 1.30 | 0.54 |
| Low Fee Alternative | Fidelity Advisor Strategic Income I | 0.71% | 7.48 | 5.09 | 6.41 | 4.94 | -0.10 | -0.37 | 1.54 | 0.78 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | FASPX $ 4,707,541 Fidelity Advisor Value Strategies M Revenue Share: 0.50 % Benchmark Index: Russell Mid Cap Value TR USD | 1.25% | 7.71 | 5.81 | 9.23 | 8.99 | 2.74 | 0.45 | -0.50 | -1.50 |
| Low Fee Alternative | FASOX Fidelity Advisor Value Strategies I | 0.62% | 8.22 | 6.31 | 9.74 | 9.50 | 3.25 | 0.94 | 0.01 | -0.99 |
| Low Fee Alternative | FLPSX Fidelity Low-Priced Stock | 0.78% | 9.32 | 7.03 | 9.99 | 10.61 | 4.36 | 1.66 | 0.25 | 0.12 |

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | FMILX $5,883,831 Fidelity New Millennium Benchmark Index: Russell 1000 | 0.55% | 5.76 | 7.46 | 11.35 | 11.17 | -15.20 | -7.36 | -4.24 | -2.84 |
| *Low Fee Alternative* | WFSPX iShares S&P 500 Index K | 0.03% | 18.43 | 14.18 | 15.20 | 13.82 | -2.54 | -0.64 | -0.40 | -0.19 |
| *Low Fee Alternative* | SWPPX Schwab S&P 500 Index | 0.02% | 18.39 | 14.15 | 15.16 | 13.81 | -2.57 | -0.67 | -0.43 | -0.20 |

140. The replacement of just these seventeen (17) funds with the low fee alternatives on the Performance Chart, or similar easily identifiable funds that use the same benchmarks, would have saved the 403(b) Plan Participants hundreds of thousands, if not millions, of dollars every year.

141. Defendants should have anticipated such underperformance for the actively managed funds in both the 401(a) Plan and the 403(b) Plan given the wealth of data showing that over the long-term, actively managed funds do not outperform their passively-managed counterparts. Indeed, as shown in the table below, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark In 5 Years |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 % |
| Mid-Cap | S&P MidCap 400 | 63.56 % |
| Small-Cap | S&P SmallCap 600 | 75.09 % |
| Multi-Cap | S&P Composite 1500 | 82.79 % |
| Domestic Equity | S&P Composite 1500 | 81.66 % |
| Large-Cap Value | S&P Value | 84.74 % |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 % |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 % |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 % |

142.   The table above is for illustrative purposes only as the significant fee disparities detailed herein existed throughout the Class Period. The Plans' expense ratios were multiples of what they should have been given the 401(a) Plan's bargaining power, which Defendants failed to utilize adequately for the benefit of the 401(a) Plan and its participants. Indeed, a careful and prudent investigation would have revealed the existence of numerous lower-cost and better performing alternatives to the 401(a) Plan's funds.

### G.   Defendants Breached Their Fiduciary Duties by Failing to Include a Stable Value Fund Among the 401(a) Plan's Investment Options

143.   Stable value funds are a common investment in large defined contribution plans like the 401(a) Plan—and, in fact, they are designed specifically for such plans. Stable value funds are conservatively managed to preserve principal and provide a stable credit rate of interest. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which

invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between. Stable Value and Money Market*, 39 Akron L. Rev. 9, 24 (2006) (In contrast to money market funds, stable value funds "can invest in longer-term financial instruments," and thus, "Stable Value Funds simply outperform Money Market Funds.").

144. In addition to longer duration instruments generating greater returns than money market investments, stable value funds provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

145. Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS, at 26, 28 (Aug. 2009).[31]

146. According to a 2015 Stable Value Study published by MetLife, over

---

[31] *Available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54- donahue.pdf (last visited July 23, 2020).

80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors*, at 5 (2015).[32] The study also notes that stable value returns were "***more than double***" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." *Id*. at 7 (emphasis added).

147.    Unlike the vast majority of large and mega 401(k) plans, the 401(a) Plan does not offer a stable value fund as its "income producing, low risk, liquid fund."

148.    Instead, during the Class Period the 401(a) Plan has offered the Vanguard Prime Money Market Fund Instl. Class, which has yielded drastically lower returns -- 0.66% over the preceding 10-year period. Such returns are approximately 25% of the returns yielded by typical stable value funds. Thus, the Vanguard Prime Money Market Fund Instl. Class was at all times an imprudent retirement investment under ERISA and Defendants violated their duty of prudence under ERISA by including it as a retirement investment option in the 401(a) Plan's menu of investment options.

---

[32] Available at:
https://www.metlife.com/content/dam/metlifecom/us/homepage/institutionalRetirement/insights/StableValue/2015-Stable-Value-Study.pdf (last visited July 23, 2020).

149. As shown in the chart below, stable value funds have provided consistently higher yields than money market peer group averages.[33]



149.

150. The table below compares returns of the Plan's Vanguard Prime Money Market Fund Instl. Class to stable value funds that would have been readily available to the Plan throughout the Class Period, and to the Hueler Analytics Stable Value Pooled Fund Universe, as of March 31, 2020.

| Fund | 1-year | 3-year | 5-year | 10-year |
|------|--------|--------|--------|---------|
| Vanguard Prime Money Market Fund Inst. Class (VMMXX)[34] | 1.33% | 1.73% | 1.25% | 0.66% |
| Invesco Stable Value Trust –Class A1 | 2.57% | 2.51 % | 2.28 % | 2.16 % |
| Vanguard Retirement Savings Trust | 2.26% | 2.15% | 2.02% | 2.14% |
| Putnam Stable Value Fund at 15 BPS | 2.41 % | 2.29 % | 2.08% | 2.23% |
| Hueler Stable Value Pooled Fund Universe Average | 2.50 % | 2.30 % | 2.10 % | 2.20 % |

---

[33] Available at:
https://institutional.vanguard.com/VGApp/iip/site/institutional/investments/StableValue?cmpgn=IIGDTG GINVDCLSRCHPSXXTLXXGENAUDDC020200629SVLPXX&msclkid=3b5fd e9f94ac14f48d0b8186 6f024729 (last visited July 23, 2020).
[34] Average annual returns, updated monthly on Vanguard.com.

151.    Underperformance of a plan's investment choices can have a dramatic effect on the accumulation of an individual's retirement savings. A difference of only 30 basis points, or three tenths of one percent, is significant in this regard. Consider an investment of $1000 over 30 years that earns 6.5%. This investment would have grown to nearly $6,600. If the same investment only earned 6.2%, the final value would only be $6,050, or 8% less. An 8% difference translates into one full extra monthly payment each year ($1/12 = 8\%$). It is the difference, to a participant, of receiving 12 payments per year or 11 payments. A 30-basis point lower return eliminates an entire month of retirement income when a participant is living off accumulated retirement savings.

152.    Hueler Analytics is the industry standard for reporting returns of stable value funds. Hueler data represents a reasonable estimate of the average returns of a typical stable value fund. The returns of the funds in the Hueler universe on average far exceeded the returns of the Vanguard Federal Money Market Fund in the Plan during the class period.

153.    In light of stable value funds' clear advantages and enhanced returns compared to the Vanguard Prime Money Market Fund, when deciding which fixed income investment option to include in a defined contribution plan, a prudent fiduciary would have included a stable value fund—and not the Vanguard Prime Money Market Fund. Defendants imprudently and disloyally failed to do this.

69

154.    As of December 31, 2018, the 401(a) Plan's Vanguard Prime Money Market Fund had more than $38,000,000 in assets. Had the funds invested in the Vanguard Prime Money Market Fund instead been invested in a stable value fund returning average benchmark returns, as represented by the Hueler Index during the Class Period, Plaintiffs and other 401(a) Plan participants would not have lost millions of dollars of their retirement savings, and would not continue to suffer additional losses as a result of the Vanguard Prime Money Market Fund being retained in the Plan.[35]

155.    Defendants' continued reliance on a money market fund as the Plans' capital preservation fund is particularly egregious after the Plans' experience with the failure of the Reserve Primary Fund (the "Primary Fund"), a money market fund managed by The Reserve, requiring HFHS, on behalf of its Plan participants, to file a lawsuit against The Reserve and related individuals and entities to protect Plan participants' rights in the continuing dissolution of the Primary Fund. Form 5500 2009, Auditor's Report at 11.

---

[35] Plan losses have been brought forward to the present value using the investment returns of the Hueler Index to compensate participants who have not been reimbursed for their losses.

**H.** **Defendants Breached Their Fiduciary Duties by Encouraging 403(b) Plan Participants to Invest Their Assets in Multiple Under-Performing Money Market Funds Rather than Equally Safe and Better Performing Stable Value Funds.**

156. As set forth above in IX.G., stable value funds provide the same protection of assets as the safety provided by money market funds. The stable value funds also provide returns of between 200 and 300% in excess of the returns provided by money market funds when analyzed over a 10-yr. time period. *See* ¶150, above. Nonetheless, Defendants offered no less than seven money market funds in the 403(b) Plan, resulting in the investment in these lackluster funds of $46,809,692 as of December 31, 2018 by Participants.

| In Plan Money Market Fund | Expense[36] Ratio | Return 1 Yr. | Return 3 Yr. | Return 5 Yr. | Return 10 Yr. |
|---|---|---|---|---|---|
| Fidelity Government Cash Reserve Fund ($5,483,118) (FDRXX) | 0.38% | 0.07% | 1.17% | 0.87% | 0.44% |
| Fidelity Government MM Fund ($9,231,268) (SPAXX) | 0.42% | 0.26% | 1.19% | 0.82% | 0.42% |
| Fidelity Government MM Prime Fund ($5,152,626) (FZCXX) | 0.37% | 0.29% | 1.27% | 0.91% | 0.46% |
| Fidelity Treasury Only MM Fund ($678,971) (FDLXX) | 0.42% | 0.26% | 1.18% | 0.80% | 0.41% |

---

[36] Per Fund fact sheets at www.fidelity.com, www.ssga.com, and www.investor.vanguard.com (last visited March 11, 2021).

| | | | | | |
|---|---|---|---|---|---|
| Fidelity Treasury MM Fund ($239,442) (FZFXX) | 0.42% | 0.05% | 1.14% | 0.82% | 0.41% |
| SSgA Instit. U.S. Government MM Fund, Admin. Class ($17,320,156) (SALXX) | 0.37% | 0.06% | 1.16% | 0.84% | 0.42% |
| Vanguard Federal MM Investor Fund ($8,704,111) (VMFXX) | 0.11% | 0.45% | 1.16% | 1.10% | 0.55% |

## I.  Defendants Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses

157. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

158.  Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such

as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

159.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

160.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

161.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

162.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money

out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "*Revenue Sharing and Invisible Fees*."[37]

163.    It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[e] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees, and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336.Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

164.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the

---

[37] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited April 25, 2021).

recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

165.   Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

166.   Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation

75

to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

167.   Defendants have failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. Defendants permitted the Plans to pay its Recordkeepers, Great-West, Empower, Fidelity Trust and FASCore, excessive fees through both standard fee arrangements and opaque revenue sharing, which is referenced on the Form 5500's as "indirect compensation".

## J.   Prudent Fiduciaries Use One Recordkeeper But Defendants Used Three for the 403(b) Plan, Causing the 403(b) Plan to Incur Excess Fees

168.   Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This use of a single recordkeeper leverages all plan assets to provide economies of scale and helps ensure plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers and avoiding duplication of services, which occur when there is more than one recordkeeper.

169.    According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeper services to participants. *See* LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013).

170.    Multi-Recordkeeper platforms are inefficient. The Standard, *Fixing Your 403(b) Plan" Adopting a Best Practices Approach,* at 2 (2009).

171.    The benefits of using a single recordkeeper are clear:

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[38]

172.    Aon Hewitt, one of the world's largest human resources consultants, authored a study, similarly recognizing:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

- Reducing the number of investment options, utilizing "open architecture" investment menu, and packaging the options within a "tiered" structure.

- Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

- Leveraging aggregate plan size and scale to negotiate

---

[38] Available at http://webarchive .org/web/20081221040932/http://www.standard.com/pensions/publications/fixing_ your_403b.pdf (last visited July 6, 2020).

competitive pricing.

Aon Hewitt, "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can be Done to Fix It" (Jan. 2016).[39]

173.    Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *High Education's Response to a New Defined Contribution Environment,* Towers and Watson Viewpoints, at 2 (2012).

### K.    The Disclosed Direct Recordkeeping Fees Paid by the Plans Were Excessive

174.    Certain recordkeeping fees that are paid directly from each participant's account are disclosed on the annual Form 5500s for the Plans for each year from 2015 to 2019.

175.    The direct compensation paid to Great-West and the other Recordkeepers is, by comparison to other plans, unreasonably high. For instance,

---

[39] Available at htts://www.aon.com/attachments/human-capital-consulting/how-403b-plans-are-wasting-nearly-10billion- annually-whitepaper.pdf (last visited July 6, 2020).

the *401k Averages Book* (20th ed. 2020), examined recordkeeping fees for plans with less than $200 million in assets (*i.e.*, substantially smaller than the Plan), and demonstrated that as plans increase in size the costs of recordkeeping generally decrease on a per participant basis—a classic example of economies of scale.

176.   For example, a plan with 200 participants and $20 million in assets, the average recordkeeping and administration cost (through direct compensation) was $12 per participant. *401k Averages Book* at 95. For a plan with 2,000 participants and $200 million in assets, the average recordkeeping and administration cost (through direct compensation) is $5 per participant. *Id*. at 108. Extrapolating from this data, the Plan, with over a billion dollars in assets and generally more than 16,000 participants during the Class Period, should have had direct recordkeeping costs below the $5 average, but it usually quadrupled that number.

177.   Here, each participant had assets in each Plan. Additionally, the disclosed, direct recordkeeping expenses ranged from $18.00 - $22.00 per participant per Plan on an annual basis. As a result, each participant was paying $36.00 - $44.00 per year for direct, disclosed recordkeeping expenses.

### L.    The Plans Also Paid Excessive Indirect Compensation

178.   While Defendants disclosed the above amounts of direct compensation to Great-West and the other Recordkeepers on the Plans' Form 5500's for the Class Period, they also checked off the box on each Plan's Form 5500s for payments of

"indirect compensation" (also known as revenue sharing) to Great-West.

179.   However, Defendants chose not to disclose the actual amounts of these large payments to Great-West, and, thus, concealed the total compensation the Plans paid Great-West as well as the Plans' total per participant recordkeeping costs.

180.   Revenue sharing payments are particularly problematic because they are asset-based, and they often bear no relation to a reasonable recordkeeping fee. Rather, revenue sharing often results in excessive compensation, and can be used as kickbacks to induce recordkeepers to include the investment company's high-priced funds included as plan investment options.

181.   As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

182.   Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing

rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014).[40] Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id*.

183.    As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan. Indeed, in May 2014, AllianceBernstein advised: "DC plans and their fiduciaries may be better served to modify or change the plan design a bit, and it might be wise to consider removing excess revenue sharing from the picture altogether. One route to that solution would be to consider share classes or investment vehicles with lower—or no— revenue-sharing rates. Daniel Noto, *Rethinking Revenue Sharing*,

---

[40] Available at: https://blog.alliancebernstein.com/post/en/2014/06/coming-to-grips-with-excess-revenue- sharing (last visited July 23, 2020).

AllianceBernstein (May 2014).[41]

184.   Plaintiffs cannot calculate the amount of indirect compensation paid by each of the Plans (and therefore their Participants) because Defendants fail to disclose the inputs that are necessary to calculate the indirect fees.

185.   Turnover may also be a factor in the amount of undisclosed indirect fees paid by the Plans and their participants.

186.   Using the information that Defendants disclosed, Plaintiffs estimate that during the Class Period, the 403(b) Plan paid Great West an additional $500,000-$700,000 per year through indirect fees.

187.   Using the information that Defendants disclosed, Plaintiffs estimate that during the Class Period, the 401(a) Plan paid Great West an additional $600,000-$1,000,000 per year through indirect fees.

188.   These amounts are far greater than recognized reasonable rates of payment for Recordkeeping expenses for large plans.

189.   Given the size of the Plans' assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided to the Plans by

---

[41]   Available at: https://www.alliancebernstein.com/Research-Publications/CMA-created-content/Institutional/Instrumentation/DC_RethinkingRevenueSharing.pdf (last visited July 23, 2020).

Great West and the other Recordkeepers. Great West and the other Recordkeepers normally performs tasks for the Plans such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping and information management (computing, tabulating, data processing, etc.)

190.    The services that Great West and the other Recordkeepers provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plans millions of dollars during the Class Period and constituted separate and independent breaches of the duties of loyalty and prudence.

191.    Contrary to Defendants' flawed approach, the practice embraced by the majority of plans with assets of $250 million or more, like the HFHS Plans, is for the plan to choose the lowest price share classes of available funds that do not pay revenue sharing and to have the plan directly pay a negotiated price for all the administrative fees, and not to engage in what amounts to an opaque kickback scheme.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against HFHS and Committee Defendants)

192.    Plaintiffs re-alleges and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

83

193.   At all relevant times, HFHS and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

194.   As fiduciaries of the Plans, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

195.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the Prudence Defendants selected and retained investment options in the Plans despite the high cost of the funds in relation to other comparable investments. Further, the Prudence Defendants created an expensive administrative construct, with three Recordkeepers for the 403(b) Plan and allowed the investment choices to grow to a confusing array of two

hundred and fifty (250) choices. The sheer number of investment choices makes it highly unlikely that the Prudence Fiduciaries regularly and diligently reviewed the performance of each of those funds to ensure they remained appropriate investment options for the 403(b) Plan. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plans. In addition, the Prudence Defendants failed to investigate separate accounts and chose a fund that was styled as a collective trust, but chose a collective trust that had an extra layer of undisclosed expenses built in, and as a result, incurred mutual fund level expenses. Moreover, the Prudence Defendants failed to investigate stable value funds as an alternative to money market funds, even though stable value funds credit participants with substantially higher interest rates without increased risk. Likewise, the Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

196.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and Plans' participants would have had more money available to them for their retirement.

197.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of

fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in her Prayer for Relief.

198.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against HFHS and the Board Defendants)

199.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

200.   HFHS and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

201.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective

action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

202.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to HFHS and the Board Defendants.

203.   HFHS and the Board Defendants breached their fiduciary monitoring duties by, among other things:

> (a.)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

> (b.)   failing to monitor the processes by which the Plans' investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost

separate account and collective trust vehicles; and

(c.)   failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, and caused the Plans to pay excessive recordkeeping fees, all to the detriment of the Plans and the Plans' participants' retirement savings.

204.   As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses. Had HFHS and the Board Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

205.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), HFHS and the Board Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in her Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

(a.)  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

(b.)  Designation each of Plaintiffs as a Class Representative and designation of Plaintiffs' counsel as Class Counsel;

(c.)  A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

(d.)  An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

(e.)  An order requiring Defendants to disgorge all profits received from, or in respect of, the Plans, and/or

89

equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

(f.) Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(g.)   An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(h.)   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of the Plans' fiduciaries deemed to have breached their fiduciary duties;

(i.) An award of pre-judgment interest;

(j.) An award of costs pursuant to 29 U.S.C. § 1132(g);

(k.)    An award of attorneys' fees pursuant to 29 U.S.C. §

1132(g) and the common fund doctrine; and

(l.) Such other and further relief as the Court deems

equitable and just.

Dated: May 5, 2021          By:    */s/* David H. Fink
                                   David H. Fink
                                   Nathan J. Fink
                                   **FINK BRESSACK**
                                   38500 Woodward Ave., Suite 350
                                   Bloomfield Hills, MI 48304
                                   Telephone: (248) 971-2500
                                   dfink@finkbressack.com
                                   nfink@finkbressack.com

                                   Eric Lechtzin
                                   (Federal Bar I.D. # 62096PA)
                                   Marc H. Edelson
                                   **EDELSON LECHTZIN LLP**
                                   3 Terry Drive, Suite 205
                                   Newtown, PA 18940
                                   Telephone: (215) 867-2399
                                   elechtzin@edelson-law.com
                                   medelson@edelson-law.com

                                   John J. Nestico
                                   (admission forthcoming)
                                   **SCHNEIDER WALLACE**
                                   **COTTRELL KONECKY LLP**
                                   6000 Fairview Road, Suite 1200
                                   Scottsdale, Arizona 85253
                                   Telephone: (704) 840-5263
                                   jnestico@schneiderwallace.com

Todd M. Schneider
(admission forthcoming)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com

*Counsel for Plaintiffs and the*
*Proposed Class*